UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| Bristol-Warren Regional School Committee | ) | |
| v. | ) | Case No. 04-521 ML |
| Melissa DaSilva, as parent and next friend | ) | |
| Of C.C.; alias The Rhode Island Board of | ) | |
| Regents for Elementary and Secondary | ) | |
| Education | | |

AFFIDAVIT OF CAROL J. KING

CAROL J. KING, BEING OF LEGAL AGE AND DULY SWORN, DEPOSES AND STATES AS FOLLOWS:

1. I am an attorney at law, having been admitted to the bar of Ohio in 1979. I was admitted to the Rhode Island bar in 1995 and to the Massachusetts bar, first in 1999 as a legal services managing attorney and fully in 2002.

2. I began my legal career as an attorney with the Ohio Legal Rights Service, a statewide, state funded organization devoted to protecting the rights of individuals with disabilities. While on staff, I handled a wide variety of cases, including special education and supervision of a junior attorney handling special education matters.

3. After entering private practice in Ohio, I continued to handle disability-related cases, both as part of my own practice and under contract with the Ohio Legal Rights Service.

4. In 1989, I began to work full-time as the Supervising Attorney in the Civil Litigation and Alternative Dispute Resolution Clinical Programs at my alma mater, The Ohio State University College of Law. This position entailed

supervising third-year law students in a wide variety of cases in litigation, including cases dealing with the rights of disabled persons. I co-taught the Trial Advocacy portion of the six-credit hour course. I trained and supervised student mediators for the local court system and co-taught the academic portion of the Alternative Dispute Resolution course.

5. I relocated to Rhode Island in 1994 to take a position as Assistant Professor of Law with the Roger Williams University School of Law. I taught several academic courses, including Trial Advocacy, Alternative Dispute Resolution, and Client Interviewing and Counseling. In 1995, I started the school's Family Law Clinic. In that capacity, I supervised third year law students in all types of domestic relations cases in the Family Courts. I also taught the academic component of the course in family law.

6. During my five years at Roger Williams, I published several articles and was promoted to Associate Professor.

7. I left teaching to take a position as Managing Attorney with the Southeastern Massachusetts Legal Assistance Corporation. The prior managing attorney had left to begin the firm with which I am now associated. I ran the Fall River office, managed several grants, supervised the work of the staff in all areas, and handled an individual caseload.

8. In 2001, the managing attorney I had replaced in Fall River asked me to join his firm, which primarily represented parents and disabled students in special education cases and related matters, such as school discipline and juvenile court

matters. I was pleased to again have the opportunity to focus in an area of the law that had long held my interest.

9. Since joining my current practice, I have concentrated in special education cases, representing parents and students in due process proceedings, school discipline matters, and related juvenile court cases.

10. A volunteer parent advocate referred Melissa DaSilva, C.C.'s mother, to me for advice and assistance in January of 2004. At that time, C.C. was repeating eighth grade. Ms. DaSilva explained that she and her advocate had attempted to obtain help from the school. For a few months in the spring of C.C.'s first year in eighth grade, the school began using the Wilson reading program with C.C. The Wilson instruction uses multisensory methods for teaching dyslexic children to read. Ms. DaSilva had asked that he be held back in eighth grade in order to continue to receive the Wilson reading program instruction. The administrators had told her C.C. would not be able to receive this instruction at the High School, as the program was not offered there. Ms. DaSilva had reached the point of total frustration when she discovered that C.C. was not receiving the promised Wilson reading program during his second year in eighth grade. Further, the school had filed a truancy court action against him, although he did not have a history of missing school. She told me her son was unable to read or write. Her goal was simply to get the school to teach him to read and write. His math skills were also very poor.

11. I agreed to review C.C.'s school file, which was voluminous. I was shocked by its' contents. In all my years of practice, I do not recall seeing such an egregious case.

12. Although C.C. had been identified as a child with special needs since preschool and had been held back twice already, his reading and written language scores ranged from a pre-kindergarten level to no better than a second grade equivalent, by the school's own testing. However, the recent cognitive testing showed he had average potential.

13. C.C. had not attained goals on his first grade IEP when he was entering high school.

14. While C.C. had always been viewed as pleasant and cooperative while in elementary school, information in the file showed that in middle school, he began to shut down and refuse to do work. This pattern is quite common in children who know they cannot function on the level of their peers. However, during the period when he was receiving instruction in the Wilson reading program, he attended every session with a positive attitude. He told me he found the Wilson program very helpful. However, this program was essentially dropped during his second year in eighth grade. C.C. adamantly insisted that he could not read his assignments or do the required work in school, but that his teachers did not believe him. Despite his years of frustration in school, he still wanted to learn to read.

15. C.C.'s mother is also learning disabled. She dropped out of the Warren schools as a teenager and has difficulty reading and writing herself. She is employed at the local Burger King restaurant.

16. Although I knew Ms. DaSilva could not pay my fees, I could not turn away her request for help. I kept regular, contemporaneous records of time spent and tasks undertaken in the case, just as I do with paying clients.

17. I appeared at the juvenile court proceedings in C.C.'s truancy case, but all the time related to that representation has been deleted from the recorded time presented to this court regarding fees for the special education matter.

18. Naively, as it turned out, I thought that the school would be willing to engage in settlement discussions in C.C.'s education matter. I spoke to several attorneys in Massachusetts to get their impressions of the facts, including the most aggressive school attorney I know. All the school attorneys said their clients would never try such a case. (I did not include any of this time in my billing statements.)

19. Since the school was unwilling to settle the matter, I prepared and filed a request for a due process hearing.

20. In all litigation, I have always told my students that preparation is the key to success. I try to take my own advice. This case required much more preparation than the "average" case.

21. At the pre-hearing conference, the school claimed that recent testing showed that C.C. had made significant gains in reading.

22. I found this statement incredible, based upon my general knowledge of the difficulty of remediating language-based learning disabilities in older children.

23. In order to contest the school's position, it became necessary to locate and hire an independent evaluator to assess C.C.'s skills and progress.

24. Normally, my clients come to me with a number of independent evaluations at our initial conference. However, in C.C.'s case, the schools' own testing revealed that C.C.'s skills were so low that I had initially found no need for independent testing.

25. C.C.'s mother was not able to locate an independent evaluator, due to her own literacy limitations. I had to do this on her behalf. I contacted a number of individuals and reviewed reports in other cases to locate someone with good qualifications who could perform the evaluation relatively quickly. I was impressed by the quality of a report I found in a colleague's case, although the evaluator did not agree with the outcome the client desired. This person agreed to evaluate C.C. This added time to the case preparation that I do not normally incur. However, I refuse to do an inadequate job for any client, including clients of limited means.

26. The school refused to consent to the independent evaluation, stating that any outside evaluator needed to be agreed upon by the school district. As this is not the law, the school's position led to additional litigation in the due process case. My client proceeded with the evaluation and I researched and drafted a motion requesting the Hearing Officer to find that the parent had a right to choose her evaluator, and a response to the school's Objection.

27. The independent evaluator recommended placement in a specialized school for C.C. Prior to this, I did not have evidence supporting such a placement. I knew

that obtaining an order for placement in a private school would be unlikely without having a specific placement to propose. I contacted many schools, including the South Coast Collaborative, the South Shore Collaborative, the Bi-County Collaborative, the Learning Prep School, the Landmark School, Eagle Hill, Wheeler, School One, the Wolf School, St. Andrews School, and the schools listed on the Department of Education website. I spoke with representatives from each school. Most schools had no programs appropriate for C.C. I gathered and sent records to the schools requesting more information.

28. I prepared and filed an extensive exhibit book in the case. I reviewed all of C.C.'s class work and homework while preparing the exhibit book, as I anticipated that one of the school's arguments would be that C.C. could do the assigned work but simply refused. I met with the independent evaluator and showed her his work to get her opinion on whether or not the work was within his capabilities. She confirmed that he could not manage the assignments. She also confirmed that it is very common for middle school students who cannot read or write well to misbehave in classes or refuse to do work. This added preparation time beyond that in "normal" cases, but was important.

29. I also located and met with a certified Wilson reading instructor, had her show me the materials, and prepared her to be a potential witness in the case.

30. The school had hired an outside clinical psychologist to evaluate C.C. I carefully analyzed her report and felt her testimony could be helpful to our case. I interviewed her, asked her many questions, and prepared questions for her.

31. The school listed 17 witnesses and reserved the right to call more. In preparation for cross-examination, I analyzed all the records relating to each person's involvement in the case and prepared possible lines of questioning, as I do in all cases.

32. The hearing was held on four separate dates over the summer. After each day, I reviewed and modified my preparation for all potential witnesses in the following days.

33. The Hearing Officer ordered three additional IEP Team meetings during the course of the due process hearing, again adding attorney time to the case.

34. I thought the school would argue that C.C. was to blame for his failure to learn to read because he refused to do work and misbehaved. To prepare for this, I located, contacted and hired a former school psychologist to interview C.C., observe him in school, do some limited testing, and review his records. This is not the usual case. Normally the parents have already consulted with psychologists by the time they contact me, but my client did not have the resources or knowledge to do this on her own.

35. The exhibits I submitted had to be supplemented, as I learned I had not received all the documents from C.C.'s school file. The school also added exhibits as the case progressed.

36. At the September 7, 2004 IEP meeting ordered by the Hearing Officer, the school wanted to re-administer cognitive testing. This was obviously an attempt to discredit the test results obtained by the middle school psychologist in November 2003. If C.C.'s scores dropped, the school would argue that although C.C. could

not read, there was no discrepancy between his ability and his performance. The parent did not grant consent, wishing to consider the matter carefully before deciding.

37. On September 8, 2003, the school's attorney filed a motion asking the Hearing Officer to order additional intelligence testing. I filed an Objection. In ordinary cases, this does not occur.

38. The Hearing Officer did not issue a ruling on the motion. Despite this, we later learned that the high school psychologist performed additional cognitive testing in September without any authorization. His testing confirmed the previous evaluation that C.C.'s cognitive ability was in the average range. The school did not disclose this information to the parent or the Hearing Officer.

39. After the close of testimony, the Hearing Officer requested written closing arguments from counsel.

40. I conducted further research, analyzed the hearing transcripts, reviewed the exhibits, and drafted a detailed closing argument.

41. In mid-November, we received the Hearing Officer's decision finding that the school had not offered C.C. a free, appropriate public education and that the parent had prevailed. He ordered to school to provide a number of services by a date certain or send C.C. to a private school.

42. The opinion did not address all the issues and was hardly a model of clarity, but granted the parent and student the main relief sought. He ordered that full neurological, psychological, and occupational therapy evaluations be completed within 30 days, and that the Team meet within 10 days thereafter. He also

ordered that C.C. receive a full reading program using the Wilson or a similar program, small group instruction in written language and math, an appropriate behavioral support plan,. And extended school year services. If the school did not comply, he ordered placement in a private school.

43. The school district appealed the ruling to this court. The parent did not appeal.

44. I needed to locate and retain local counsel, as I was not a member of the bar of the District Court of Rhode Island.

45. On March 1, 2005, I filed a Motion for Private Placement and supporting affidavits with the hearing officer, stating that the school had not complied with the terms of his Order and requesting enforcement. He responded by letter stating that he had no further jurisdiction in the case.

46. I prepared a Motion for Remand of the case to the Hearing Officer for clarification and completion of his Order and for placement outside the high school. I brought the Motion to the pretrial conference on April 1 but did not file it, as the parties agreed to exchange settlement proposals. The parties did not reach agreement.

47. Counsel then researched, drafted and filed a Motion for Preliminary Injunction and supporting affidavits with the court, seeking enforcement of the Hearing Officer's order. C.C. was not receiving instruction in the Wilson or a similar appropriate program. The Motion was stayed when the parties reached partial agreement with the assistance of Magistrate Judge Lovegreen. All issues except attorney's fees were recently resolved.

48. The contemporaneous computer based billing records submitted with this Petition accurately record the time I spent on this case. When a larger number is found in parentheses, it reflects time actually spent but not billed.

49. I have received no payments for my work on this case.

Signed under the pains and penalties of perjury this 30th day of June, 2006.

Carol J. King

Carol J. King
Wallace Law Office, P.C.
One Post Office Square
Sharon, MA 02067
781/793-0575